# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-3674 |
| | § | |
| ALBERT FASE KALETA and | § | |
| KALETA CAPITAL MANAGEMENT, | § | |
| INC. *et al.*, | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| BUSINESSRADIO NETWORK, L.P. | § | |
| d/b/a BizRadio and DANIEL | § | |
| FRISHBERG FINANCIAL SERVICES, | § | |
| INC., d/b/a DFFS CAPITAL | § | |
| MANAGEMENT, INC., | § | |
| Relief Defendants. | § | |

## MEMORANDUM AND ORDER

Before the Court in this receivership proceeding are claims of individuals

("Investors") asserting security interests in the proceeds of the sale of certain radio

station assets held by a Court-appointed receiver, Thomas L. Taylor, III, Esq.

("Receiver") to South Texas Broadcasting, Inc. ("STB").  The Investors claim security

interests in the proceeds of the radio station assets through contractual and equitable

subrogation to the secured status of two entities, Industrial Info Resources, Inc. ("IIR") and STB, which entities made secured loans with the radio station assets as collateral.[1]   The Court conducted an evidentiary hearing on October 3, 2011 ("Hearing") regarding the sale of the radio station assets.   Prior to and after the Hearing, the Investors filed Objections in Support of Investor Objections to Sale ("Objections") [Docs. ## 70, 71, 80, 82, 110, 111, 123, 132] and the Receiver filed

_____

[1]      The Investors are Ronald and Lavonne Ellisor, Doug and Kay Shaffer, Richard Kadlick, Steve Cook, Larry Mullins, TR Dunn Family Trust, Florence Reiley, Ed and Helena Gray, Kevin Deering, Martin Grosbol, James and Patricia Stewart, Timothy Koehl, Marcus Erickson, Robert Ficks, Kohur Subramanian, and John Willis, as executor of the Estate of Geraldine J. Willis.  *See* Investors' "Senior Liens" Summary ("Investors Summary")  [Doc. # 123-1], at 16.

Also listed is Investor Phillip Jones.  He is not included in the Investors' Post-Hearing Brief, [Doc. # 132], at 1, but is listed on the Investors Summary, in which Investors' counsel identified claims at issue for purposes of the Investors' Objections here.  *See* Investors Summary [Doc. # 123-1], at 16.  The Investors' Post-Hearing Brief lists one individual with the same last name, "Alisa K. Jones."   To the extent the latter individual represents Phillip Jones or vice versa, the Court reaches their claims. Tompkins, Inc. and Ronald Martens also are named on the Investors Summary. However, that Summary does not indicate any funds transferred from Tompkins, Inc. and Martens to IIR or STB, *see id.*, and thus these Investors have failed to prove their claims for reasons explained hereafter.  The Court does not rule on these two claims.

Sailaja Uri Konduri, Diane and Paul Collings, Johnny and Betty Gauntt, Tony Huerta, Jacob Tsabar, Kurt Everson, George and Marene Tompkins, Richard Burkhart, James Maas, Bob and Kathy Horlander, Don Keil, Dr. Gerald Crouch, Paul and Simona Williams, Carlos Barbieri, Ivan Curiel, Jack McElligot, Pamela McElligot, and Raymond Warner are listed in the Investors' Post-Hearing Brief but are not named on the Investors Summary.  The Court does not specifically rule on the claims of these individuals, but the principles set forth in this Memorandum and Order govern these investors to the extent applicable factually.

responses [Docs. ## 81, 114, 121, 140].  Having considered the full record in this case, the parties' arguments, and governing legal authorities, the Court rejects the Investors' claims.

## I.      BACKGROUND

Defendants Albert Kaleta ("Kaleta"), Daniel Frishberg ("Frishberg"), and Kaleta Capital Management ("KCM") allegedly perpetrated several frauds related to promissory-note securities.  In one alleged scheme, Defendants solicited investors to make loans to certain entities related to radio station KTEK 110 AM, operated by Kaleta, Frishberg, and/or KCM.  These entities include BusinessRadio Houston, LLC ("BR Houston"), BusinessRadio Network L.P. ("BR Network"), BusinessRadio Licensee, LLC ("BR Licensee"), and Biz Radio Network, LP ("Biz Radio").  The Investors, on various dates from April 2008 through January 2009, made investments through their agent, Wallace Bajjali Development Partners, LP ("WB Development Partners").  Biz Radio is not registered as an entity in Texas or Delaware[2] and there is no evidence this entity has any legal existence.

On November 13, 2009, the Securities and Exchange Commission ("SEC") commenced this action against Kaleta, Frishberg, and KCM, alleging violations of the anti-fraud provisions of the federal securities laws [Doc. # 1].  The Court subsequently

---

[2]       STB Exs. 21, 22.

appointed Taylor as the Receiver for KCM [Doc. # 7] and Relief Defendants BR Network, and Daniel Frishberg Financial Services, Inc. d/b/a DFFS Capital Management, Inc. ("DFFS") (collectively, the "Receivership") [Doc. # 34].  The Receivership's assets included the radio station and related assets.

On March 7, 2011, the Receiver moved the Court for entry of orders approving bidding and sale procedures and approving the sale of radio station assets free and clear of all liens, claims, encumbrances, and other interests [Docs. ## 62, 65, 72, 119]. Investors filed, then subsequently amended and supplemented and, finally, withdrew, various objections to the sale of the radio station assets to STB [Docs. ## 70, 71, 80, 82, 110, 111, 123, 132].  The issue of whether the Investors hold a perfected security interest in the sale of the radio station assets remains hotly contested [*See* Docs. ## 132, 140].

The Investors argue that they hold senior perfected security interests in certain BR Houston assets by virtue of contractual and equitable subrogation to the interests of IIR and/or STB or its parent or affiliate, Salem Broadcasting.[3]  IIR held a senior perfected interest in BR Houston by virtue of secured loans made by IIR to BR

---

[3]     The parties do not dispute that Salem Broadcasting is an affiliate of STB, but do not explain the entities' precise relationship.  *See* Transcript [Doc. # 138], at 57.  Under the Subordination and Intercreditor Agreement among STB and WB Fund II, as agent for IIR, STB is the "Subordinate Lender" and IIR is the "Senior Lender."  *See* Investors Hearing Exhibit ("Investors Ex.") 1, at 1.

Houston through IIR's Administrative Agent, Wallace Bajjali Investment Fund II, L.P. ("WB Fund II").[4]  The IIR loan helped to finance BR Houston's purchase of certain radio station assets from STB, and STB took a subordinated note from BR Houston on those assets as partial payment.[5]  Under the IIR Subordination Agreement among STB and WB Fund II, as agent for IIR, any subsequent lender that pays off some or all of the "Subordinate Loan" (STB's loan) or the "Initial Senior Loan" (IIR's loan) provides "Replacement Financing"; such a subsequent lender may become a "Senior Lender" with higher priority than STB.[6]

The Receiver contends that the Objecting Investors are not contractually or equitably subrogated to the interests of IIR or STB because (1) the Investors cannot trace their funds to payments of either IIR or STB's loan, or their funds were commingled with tainted funds from Kaleta, Frishberg, and KCM; (2) equity disfavors tracing their funds; (3) the Investors lack perfected interests in BR Houston assets; (4) the Investors are not contractually subrogated to IIR or STB; and (5) the Investors are not equitably subrogated to IIR or STB.  The threshold issues under contractual or

---

[4]   WB Fund II is a distinct entity from WB Development Partners, the entity through which the Investors invested in the nonexistent Biz Radio.

[5]   Receiver's Pre-Hearing Brief [Doc. # 81], at 7-8; Investors Amended Pre-Hearing Brief [Doc. # 111], at 8.  In effect, BR Houston borrowed funds from IIR to purchase radio station assets from STB.

[6]   *See* Investors Ex. 1, at 8, § 6.

equitable subrogation theories are whether the Investors have established that their funds paid the debts of BR Houston to IIR or STB and whether they hold duly enforceable secured interests in the radio station assets. The Court also addresses whether the Investors meet the other requirements of contractual and equitable subrogation.

## II.   <u>DISCUSSION</u>

Subrogation "is a substitution of one person in place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to a debt or claim, and its rights, remedies, or securities."  73 AM. JUR. 2D SUBROGATION § 1 (2d ed. 2011).  Texas law provides for both contractual and equitable subrogation, *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142-46 (Tex. 2008); *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649-50 (Tex. 2007), and requires that the party seeking subrogation establish that its funds paid off the debt of another.  *See In re Hwang*, 452. B.R. 187, 193 (N.D. Tex. 2011) ("burden of proof is on the one claiming equitable subrogation"; party seeking subrogation did not "meet its burden . . . because it did not establish that its predecessor . . . in fact paid off the [debt]"); *Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp.* 309 S.W.3d 619, 633 (Tex.App.—Houston [14 Dist.] 2010) (evidence produced by party seeking subrogation "conclusively proved that proceeds from [a subsequent note] were used

to pay off [a prior note]"); *Reliable Life Ins. Co. v. Brown & Root, Inc.*, 607 S.W.2d 621, 631 (Tex. Civ. App.—Waco 1980, reh'g denied) (proof from party seeking subrogation was "far from conclusive" and not "competent" as to the amount of party's funds, if any, that were used to discharge the indebtedness); 73 AM. JUR. 2D SUBROGATION § 84 ("The burden is generally on the party claiming subrogation to show that he is entitled to it.").

A. **Tracing Issues and Commingling of Funds**

The Investors have identified twenty-three monetary transfers that they argue create interests subrogated to IIR or STB's secured claims against BR Houston.[7] The

---

[7]    The Investors claim their funds were included in one or more of the following payments:

| Date of Payment & Payee | Amount of Payment |
| --- | --- |
| May 15, 2008 to STB | $200,000 |
| July 3, 2008 to STB | $130,000 |
| Jul. 8, 2008 to STB | $400,000 |
| Jul. 8, 2008 to STB | $865,000 |
| Jul. 16, 2008 to STB | $276,824 |
| July 21, 2008 to IIR | $265,000 |
| July 24, 2008 to IIR | $95,000 |
| Aug. 1, 2008 to IIR | $136,231 |
| Sept. 30, 2008 to IIR | $248,000 |
| Sept. 30, 2008 to IIR | $472,947 |
| Jan. 5, 2009 to IIR | $315,000 |

(continued...)

Investors rely on records of Wallace Bajjali Fidelity Account Nos. 636-299103 (the "11% Account") and 636-299189 (the "12% Account") to claim that they funded transfers to IIR or STB.[8]  The Court's close review of these and other documents, however, reveals that the vast majority of the Investors cannot establish that their personal funds were paid to IIR or STB, a threshold predicate for subrogation.  In summary, for some of the Investors, the balances for the WB Development Partners accounts dipped to almost zero after the Investors' payments and before the later sizeable transfers to IIR or STB claimed by the Investors, made after others' funds replenished the accounts.  The lowest intermediate balance rule thus defeats these Investors' claims.  For many, there is no evidence that those Investors' funds (as opposed to others' commingled funds) were used in the identified transfers.  For yet other Investors, their funds were commingled with substantial pre-existing balances in the 11% and 12% Accounts or other large sums deposited on the day (if not the same time) as the Investors and before remittances from the accounts to IIR or STB.

*Lowest Intermediate Balance Rule.*–  Money is fungible.  *See Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997).  The lowest

---

[7]     (...continued)

        Investors Summary [Doc. # 123-1], at 16.

[8]     *See* Investors Ex. 9.A-9.F [Doc. # 123].

intermediate balance rule is often applied in trust cases where trust proceeds are commingled with non-trust proceeds in a debtor's account. *See In re Al Copeland Enter.*, 991 F.2d 233, 235 n.1 (5th Cir. 1993); *Vaughn Motors, Inc. v. Weathers*, No. 00-50358, 2001 WL 85918, at *2-*3 (5th Cir. Jan, 25, 2001) (unpublished) (citations omitted) (applying the lowest intermediate balance rule to commingled funds). According to the lowest intermediate balance rule, "if the balance of cash on hand on any interim day was less than the amount of the trust fund claims, then the trust fund claims are limited to that 'lowest intermediate balance.'" *In re Al Copeland Enter.*, 991 F.2d at 235 n.1; *accord U.S. v. McConnell*, 258 B.R. 869, 875 (N.D. Tex. 2001) (citations omitted).  Investors Martin Grosboll, James Stewart, Geraldine Willis, and Tim Koehl's claims are defeated by this rule.  These Investors claim their funds were included in a September 30, 2008 transfer to IIR totaling $472,947.  The balance in the 12% Account in which these Investors' funds were deposited dipped below $620 after the these Investors' funds were received into that account and before the September 30 transfer to IIR.  The Court adopts the argument by the Receiver in his post-hearing brief that these Investors cannot trace their transfers to payments to IIR or STB.[9]

---

[9]     Receiver's Post-Hearing Brief [Doc. # 140], at 10-11 n.3.

*Other Failures of Proof of Tracing of Payments to IIR or STB.–* Other Investors' subrogation claims fail because they Investors have not demonstrated by a preponderance of the evidence that their claimed contributions actually were paid into the 11% and 12% Accounts or were used to make payments from those Accounts to IIR or STB.  First, it is noted that the Investors' proof is materially incomplete or inconsistent.  A comparison of bank statements in evidence[10] with summaries prepared by David Wallace ("Wallace Summary")[11] and Investors' counsel ("Investors Summary"),[12] loan documents with the Investors,[13] and Wallace's Hearing Testimony ("Wallace Test.")[14] reveals that many of the Investors' claims are not supported by the dates and amounts of account deposits shown by the bank records to have been made by those Investors.[15]  In addition, several Investors lack loan documents showing the

---

[10]    Investors Ex. 9.A-9.F.

[11]    Investors Ex. 9.G.

[12]    Investors Summary [Doc. # 123-1], at 16.

[13]    *See, e.g.*, STB Exs. 47, 48, 74, and 75 [Doc. # 122].

[14]    Wallace Test. [Doc. # 138].

[15]    There are no bank statements, for example, to support contentions regarding Ellisor's $30,000 and $10,000 claims, T.R. Dunn Family Trust's $20,000 claim, Subramanian's $313,032 claim, Jones' $165,000 claim, Grosbol's $14,000 and $36,000 claims, and Erickson's $148,000 claim.  *See* Receiver's Post-Hearing Brief [Doc. # 140], at 11-14 nn. 5, 7 and exhibits cited therein.  Although bank statements show a payment by Erickson for $150,000 to the 11% Account on September 24, 2008, the amount and date of this payment does not match the Investors' claim of a
                                                                                                    (continued...)

claimed amounts or loan dates.[16]   Moreover, a close review of the 11% and 12%

Accounts bank statements reveals that, significantly, at most relevant times the

accounts had substantial preexisting balances consisting of funds from other investors

or elsewhere and/or the Investors' funds were deposited on the same day as and

commingled with other investors' money.[17]   The Investors therefore have failed to

---

[15]   (...continued)
$148,000 loan on September 30, 2008.  *See* Investors Summary [Doc. #123-1], at 16.
Similarly, although bank statements show a payment by Grosbol for $50,000 to the
12% Account on July 29, 2008, the amount and date of this payment does not match
the Investors' claim that Grosbol made $36,000 and $14,000 loans on August 1, 2008
and August 11, 2008, respectively.  *See id.*

Bank statements do not show that Gray's $50,000 investment payment was made, as
Investors claim, to the 12% Account; rather, the bank records indicate funds were
deposited into the 11% Account.  Further, there is no indication in the bank records
or the Wallace Summary that Mullins made a payment to IIR or STB on July 15,
2008.  *See* Receiver's Post-Hearing Brief [Doc. # 140], at 11-14 nn. 4, 7 and exhibits
cited therein.

[16]   There are no promissory notes or security agreements reflecting the claimed loan
amounts or dates of investments by Ellisor for a $30,000 payment, Jones for a
$165,000 payment, T.R. Dunn Family Trust for $20,000, Grosbol for $14,000 and
$36,000, or Erickson for $150,000 and $148,000.  *See* Investors Summary [Doc.
#123-1], at 16.  Although there is a 12% Note and Security Agreement with Investor
Grosbol for $50,000, *see* STB Ex. 76, Grosbol Promissory Note for $50,000 to 12%
Account; STB Ex. 77 Grosbol Junior Security Agreement for 12% Account, the
Investors do not claim that Grosbol made one single $50,000 loan; they claim that
Grosbol made two loans, for $14,000 and $36,000, each on separate dates.  *See*
Investors Summary [Doc. #123-1], at 16.

[17]   This evidentiary deficiency defeats some or all of the claims of Grosbol, Schaffers,
Kadlick, Cook, the TR Dunn Family Trust, Reiley, Gray, Deering, Ellisor.  *See*
Receiver's Post-Hearing Brief [Doc. # 140], at 11-13 nn. 5, 7 and exhibits cited
therein.

present persuasive evidence that any particular Investor's funds were used as part of any particular payment of the IIR or STB loans.  Further, certain investors' funds appear to have been paid at least in part to BR Network[18] or to "BizRadio,"[19] neither of which received the IIR or STB loans.  Indeed Biz Radio is not a legally-registered entity.  Thus, the Court holds that each of the above-noted Investors' claims of priority based on payment of BR Houston's notes due to IIR and STB are rejected.

**_Commingling with Tainted Funds._**–  The Investors' contentions regarding tracing also fail to some extent because a party seeking subrogation has the burden to establish that the funds it used to pay off the debt of another were "untainted."  *Cf. United States v. McConnell*, 258 B.R. 869, 874 (N.D. Tex. 2001); *In re Hyang Ran Hwang*, 452. B.R. 187, 193 (N.D. Tex. 2011); 73 AM. JUR. 2D SUBROGATION § 84. Due to the fungibility of money, any commingling generally is enough to warrant treating all funds as commingled.  *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) (citing *United States v. Moore*, 27 F.3d 979, 976-77 (4th Cir. 1994)) ("Once proceeds become tainted, they cannot become untainted."); *U.S. v. Tencer*, 107 F.3d

---

[18]    This is true of certain Ellisor payments.

[19]    This is true of certain payments by TR Dunn Family Trust, Koeh, and Erickson and possibly others.  For example, Erickson's claim for a $148,000 loan to IIR on September 30, 2008 conflicts with the Wallace Summary, which shows that this amount was transferred as part of a $20,000 transfer to "BizRadio" on October 7, 2008.  *See* Investors Ex. 9G.

1120, 1131 (5th Cir. 1997);[20] *SEC v. Byers*, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009);[21] *SEC v. Lauer*, No. 03-80612-Civ, 2009 WL 812719, at *4-*5 (S.D. Fla. Mar. 26, 2009).  Transfers from a Ponzi scheme are presumptively tainted because a Ponzi scheme is, as a matter of law, insolvent from inception.  *See Quilling v. Schonsky*, 247 F. App'x 583, 586, 2007 WL 2710703, at *2 (5th Cir. 2007) (unpublished) (citations omitted) (applying the Texas Uniform Fraudulent Transfer Act).[22]  David Wallace testified at the Hearing that periodic payments of principal and

---

[20]    In *Tencer*, the Fifth Circuit noted

> several district courts have upheld the forfeiture of the entire balance of accounts containing both tainted and untainted funds.  There, courts have concluded that the commingling of crime proceeds and "clean" money makes money laundering less difficult and may even be necessary to successful completion of the offense.  Such untainted funds have therefore been found to be "involved" for purposes of the forfeiture statute.

107 F.3d at 1134 (citations omitted).

[21]    In *Byers*, a group of investors objected to a pro rata distribution plan claiming they were the only investors entitled to a distribution from a specific account into which they could trace their investments.  *Id.* at 176.  The court held that mere "coincidence cannot be a basis to treat [certain] investors more favorably" than other similarly situated investors.  *Id.*  Moreover, the court observed that only some evidence that commingling occurred is sufficient to support a pro rata distribution of all assets, and thereby rejected any priority claims.  *Id.* at 179.

[22]    Investors cite *United States v. Davis*, 226 F.3d 346 (5th Cir. 2000); *United States v. McConnell*, 258 B.R. 869 (N.D. Tex. 2001), *aff'g in part, rev'g in part In re Flying Boat, Inc.*, 245 B.R. 241 (N.D. Tex. 1999); *United States v. Loe*, 49 F. Supp. 514 (E.D. Tex. 1999), to argue that "cases in the Fifth Circuit approve tracing of funds in commingled accounts or tainted accounts if tracing is possible without significant
(continued...)

interest were made by BR Network to Wallace Bajjali in connection with Investors'
promissory notes from BR Network, which were put into the 11% and 12% Accounts
in which the Investors' funds were held.[23]  BR Network's account spreadsheet[24] also
demonstrates that BR Network made at least one payment back to the 12% Account.[25]

Two Investors, Ficks and Erickson, may have made payments directly traceable
to loan repayments on September 24, 2008 and September 26, 2008 to IIR.[26]  The
Receiver contends that these payments were commingled with fraudulent proceeds
from Kaleta, Frishberg, and/or KCM and that the records of Network and other entities
are unreliable.   Without definitely resolving the Receiver's contentions, these

---

[22]        (...continued)
           burden on the Court."  Investors Post-Hearing Brief [Doc. # 132], at 12.  In these
           cases, unlike in the instant case, various transfers were supported by evidence.  *See
           Davis*, 226 F.3d at 357 (government proved that aggregate withdrawals from
           commingled account exceeded the amount of clean funds available); *McConnell*, 258
           B.R. at 876 (government met its burden of tracing); *Loe*, 49 F. Supp. at 523
           (observing that the court could trace the clean funds based on evidence).
           Accordingly, these cases do not apply here.

[23]       Wallace Test.  [Doc. # 138], at 130-131.

[24]       Investors Ex. 11.

[25]       An entry for May 23, 2008 indicates "Repayment P&I on 12% Secured Note" for
           $499,967.  Investors Ex. 11.  The earliest payment into the 12% Account is from
           Gray, who, according to the bank statements, transferred $75,000 on July 22, 2008.
           *See* Investors Ex. 9.B.

[26]       *See* Receiver's Post-Hearing Brief [Doc. # 140], at 15 & n.8.  The Wallace Summary
           shows Erickson's $148,000 payment as being attributable to BizRadio, not to IIR or
           STB, *see* Investors Ex. 9.G, and is thus not traceable to the secured loans by the
           Investors' admission.

investors' claims fail for reasons set forth below.

**_Equity Does Not Support the Investors' Position on Tracing._**–   Investors in a Ponzi scheme generally occupy equivalent positions.  *See, e.g.*, *U.S. v. Durham,* 86 F.3d 70, 72-73 (5th Cir. 1999) (citing and upholding district court finding that all "fraud victims were in equal positions and should be treated as such.").  Accordingly, courts recognize that equity should not permit one group a preference over another and that as a result, some investors will receive less than they would under a tracing distribution.  *See id.*  In *Durham,* it was "uncontested by [the] court or [any] party that all but $8,803.99 of the money in the [relevant] accounts could be traced to seven claimants." *Durham*, 86 F.3d at 72.  Nevertheless, the district court declined to find that the investors' assets could be traced because the "ability to trace the seized funds to [certain parties was] the result of the merely fortuitous fact that the defrauders spen[t] the money of the other victims first."  *Id.*  The Fifth Circuit affirmed, emphasizing that a district court, "in exercising its discretionary authority in equity, was not obliged to apply tracing" even where there was no dispute that tracing would have been permissible.  *Id.* at 72-73 (citations omitted); *see also SEC v. Forex Asset Mgmt.*, 242 F.3d 325, 331 (5th Cir. 2001) (emphasizing that a district court is vested with broad discretionary powers to determine the most equitable remedy).[27]  In

---

[27]    In *SEC v. PrivateFX Global One, Ltd., et al.*, 778 F. Supp. 2d 775, 783-84 (S.D. Tex. (continued...)

utilizing those broad equitable powers, district court courts often support the implementation of pro rata distribution plans. *See, e.g., Forex Asset Mgmt,* 242 F.3d at 330-32.

This Court adopts this reasoning.   A pro rata distribution plan is more appropriate than tracing in this case.  Kaleta and Frishberg solicited the Investors at bar as well as many others.[28]  It is merely fortuitous that the Investors happened to invest through WB Development Partners.[29]  In cases where investors are similarly situated, equity favors treating them alike.   Moreover, most of the Investors failed to demonstrate that their specific funds paid IIR or STB's loans or that their funds were in accounts untainted by fraudulently-obtained money.  Accordingly, equity does not support tracing the Investors' funds.

The Court denies the Objections because the Investors cannot trace their funds to payments of IIR or STB, some of the Investors' funds were tainted with

---

[27]  (...continued)
2011), Judge Gray Miller also approved a pro rata plan of distribution over the objection of a group of investors who could trace their funds directly to segregated accounts and argued that they should be the sole recipients of any distribution from those accounts. *Id.* at 778.  Relying on *Durham* and *Forex*, Judge Miller rejected the investors' tracing arguments and approved the pro rata plan of distribution.  *Id.* at 781-84.  *See also SEC v. Amerifirst Funding, Inc.*, No. 3:07-CV-1188-D, 2008 WL 919546, at *4 (N.D. Tex. Mar. 13, 2008).

[28]  Wallace Test. [Doc. # 138], at 105; Ellisor Hearing Test. ("Ellisor Test.") [Doc. # 138], at 164.

[29]  *See* Wallace Test. [Doc. # 138], at 118.

fraudulently-obtained monies, and equity disfavors benefitting certain defrauded investors (the Investors) similarly situated to other defrauded investors.

## B.   <u>Contractual Subrogation</u>

Even if the Investors were able to trace the expenditure of their funds in repayments of the IIR or STB loans, and the Court were so inclined to exercise its equitable discretion to permit tracing, these Investors would not prevail under their contractual subrogation theory because they failed to comply with the "Replacement Financing" requirements described in IIR's original loan documents.[30]

The Texas Supreme Court has observed that contract-based subrogation rights should be governed by the parties' express agreement and not invalidated by equitable considerations that might control in the absence of an agreement. *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648-650 (Tex. 2007).[31] The claim is created by an agreement that grants the right to pursue reimbursement from a third party in exchange for

---

[30]   Although the Investors contend that they are subrogated to both IIR and STB's security interests in BR Houston's assets, the Investors principally rely on the IIR loan documents for their arguments. *See* Investors Pre-Hearing Brief [Doc. # 123-1], at 4. The Investors do not cite any STB loan documents besides the Subordination and Intercreditor Agreement among IIR, WB Fund II, and STB, ("IIR Subordination Agreement"), Investors Ex. 1, and as discussed *infra* note 42, the Court is unpersuaded that the IIR Subordination Agreement is a basis for the Investors' contractual subrogation claims.

[31]   Thus, "[w]here a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Fortis*, 234 S.W.3d at 648-49.

payment of a loss. *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007). In this case, there are no agreements between IIR and the Investors stating that these Investors' rights are subrogated to IIR's. The Investors' own loan documents do not bind BR Houston because those loan documents are between the Investors and Biz Radio, a non-existent entity distinct from BR Houston. Under a contractual subrogation theory, therefore, the Investors must qualify as secured lenders by meeting the requirements of IIR documents for Replacement Financing.

The Investors argue that they bargained for and received a first Priority Perfected Security Interest as subsequent creditors, as Replacement Financing, as Senior Secured Noteholders, or as "other senior lenders," as defined in (1) IIR's Senior Secured Promissory Note from BR Houston ("IIR Initial Note"),[32] (2) IIR's Security Agreement with BR Houston through its Administrative Agent WB Fund II ("IIR-BR Houston Security Agreement"),[33] (3) the UCC Financing Statement filed by WB Fund II as Agent for IIR ("IIR UCC Filing"),[34] or (4) IIR's Subordination and Intercreditor Agreement ("IIR Subordination Agreement").[35] These arguments fail as to the

___

[32]    Investors Ex. 6, at 2, ¶ 4.

[33]    Investors Ex. 2, at 1, 4.

[34]    Investors Ex. 4.

[35]    Investors Ex. 1, at 8. The Investors also claim that their priority security interests were ratified by the Subordination Agreement among WB Development Partners, BR
                                                                                                            (continued...)

Investors except Erikson and Fisk because only these two Investors have made even a colorable threshold showing that they can trace their funds to IIR.  The Court therefore turns to (1) whether these two Investors have proven entitlement to a contractually subrogated priority security interest in BR Houston assets and (2) whether those interests are perfected.

### 1.    Loan Documents

The IIR Initial Note and the IIR-BR Houston Security Agreement are sophisticated commercial contracts that anticipate there might be "Replacement Financing" for IIR's loan and that those who provide Replacement Financing under the requirements of the loan documents were to become "senior lenders."  IIR's March 28, 2008 Initial Note for $4,000,000, for example, signed by BR Houston, provides for the priority of interests on BR Houston "collateral":

> The principal amount, plus all interest accrued, shall be senior in right of payment and security to the indebtedness owed by [BR Houston] to Seller [STB] and shall be pari passu in right of payment and security to any other

---

[35]    (...continued)
Houston, BR Licensee, and BR Network ("Crider Agreement").  *See* Investors Pre-Hearing Brief [Doc. # 123-1], at 8 (citing Investors Ex. 3, at 3, ¶ 10).  The Crider Agreement is not a viable source of rights for the Investors' contractual subrogation claims because this document is dated January 31, 2010, months after the Investors made their loans.  The Investors argue no basis for any retroactive effects of this document, and it does not provide grounds for either contractual or equitable subrogation.

indebtedness of the Company for money borrowed that is Replacement Financing.[36]

The March 28, 2008 Security Agreement between BR Houston and WB Fund II as Administrative Agent for IIR similarly anticipates replacement financing by subsequent "senior lenders," by noting that BR Houston "intends from time to time to borrow additional funds from other lenders to pay amounts owing under the IIR Note . . . and amounts owing to South Texas Broadcasting, Inc.":[37]

> [BR Houston intends] to issue to such lenders (other than South Texas Broadcasting, Inc.) additional senior secured promissory notes that are secured by this Agreement on a *pari passu* basis with the IIR Note (such promissory notes, together with the IIR note, are collectively referred to herein as the "Senior Secured Notes" . . . ) and that are senior in right of payment and priority to the subordinated secured promissory notes issued by the Borrower to South Texas Broadcasting, Inc.[38]

---

[36]     Investors Ex. 6, at 2, ¶ 4.  The Initial Note also anticipates that BR Houston could obtain additional financing up to a maximum of $1,750,000 "plus any portion of this Note that is paid with the proceeds of such Replacement Financing":

> The parties hereto acknowledge that [BR Houston] intends to obtain additional financing secured by the Collateral and use the proceeds of such financing to, among other things, satisfy [BR Houston's] obligations under the Initial Note and the promissory notes issued by [BR Houston] to Seller [STB] ("the Replacement Financing," which term shall include any additional financing borrowed by the Company to repay any such Replacement Financing)."

*Id.*  Here, the Investors claim to have lent a total of $2,952,856 to IIR or STB, which does not exceed the payment maximum.  *See* Investors Summary [Doc. # 123-1], at 16.

[37]     Investors Ex. 2, at 2.

[38]     *Id.*

For Replacement Financing lenders to become "senior lenders" with priority rights, the IIR-BR Houston Security Agreement requires that BR Houston "take or cause to be performed such acts and actions as shall be necessary or appropriate to assure that the [security interest] upon the Collateral shall not become subordinate or junior to the security interests, liens or claims of any other person or entity."[39]

The Investors do not have a valid claim for contractual subrogation because their loan documents do not meet the requirements in the IIR-BR Houston Security Agreement. The Investors made either 11%[40] or 12%[41] loans to Biz Radio, not to BR

---

[39]   Investors Ex. 2, at 4, ¶ 5.

[40]   Investor Ficks has a 11% Promissory Note for $100,000 ("11% Note"), signed by Kaleta as Biz Radio's General Partner, and a "Security Agreement" for $100,000 ("11% Agreement"), signed by Biz Radio and WB Development Partners acting as Ficks' agent. *See* STB Ex. 44, Ficks Promissory Note for 11% Account; STB Ex. 45, Ficks Promissory Note for 11% Account; STB Ex. 46, Ficks Security Agreement for 11% Account.

[41]   Investor Erickson's 12% loan documents are not in the record, which further undermines his claim. However, many of the Investors who invested in the 12% Account do have loan documents in the record corresponding to their claims here. Irrespective of the lack of documentation of Erickson's "loans," the Court reviewed sample 12% loan documents, *e.g.,* the 12% Promissory Note ("12% Note") and "Junior Security Agreement" ("12% Agreement") between Biz Radio and the Investors' agent WB Development Partners for Investor Subramanian. *See* STB Ex. 26, Subramanian Promissory Note for 12% Account; STB Ex. 27, Subramanian Junior Security Agreement for 12% Account.

As discussed *supra* note 26, the Court considers only Erickson's claim for a $150,000 loan to IIR. Erickson's claim for a $148,000 loan to IIR on September 30, 2008 conflicts with the Wallace Summary, which shows that this amount was transferred (continued...)

Houston.   The Investors' Notes and Agreements accordingly do not meet the requirements for "Senior Notes" or "Replacement Financing" set by the IIR-BR Houston Security Agreement and related documents.[42]

The Investors also did not execute a "counterpart" to the IIR-BR Houston Security Agreement.  The IIR -BR Houston Security Agreement provided that each payee named in a "Senior Secured Note will be *permitted* to execute a counterpart of this Agreement concurrently with the Borrower's delivery to such payee of its Senior Secured Note and *thereby become a Secured Party*."[43]  The IIR Agreement requires execution of a security agreement in order for a subsequent lender to become a "Secured Party."   There is no proof in the record that the Investors obtained BR Houston's agreement to grant new security interests because BR Houston did not sign

---

[41]    (...continued)
as part of an October 7, 2008 $20,000 transfer to "BizRadio," not IIR.

[42]    The Investors also argue that a Subordination Agreement between IIR and STB provides a basis for Investors' contractual subrogation claims.  *See* Investors Ex. 1. The Court is unpersuaded.  The Subordination Agreement establishes rights between the signatories; it does not expressly establish rights for non-signatory BR Houston. Moreover, section 21 of the Subordination Agreement provides that the agreement is not intended to benefit others and requires that any modifications be made by an agreement in writing.  Investors Ex. 1, at 17.  The Investors provide no evidence that IIR and STB made any modifications in writing to benefit the Investors.

[43]    Investors Ex. 2, at 1 (emphasis added).  A "Secured Party" means "the Initial Secured Party for so long as any indebtedness remains unpaid under the IIR note," "each other payee named in any of the Senior Secured Notes," and the Administrative Agent.  *See id.*, at 1-2, ¶ 1.

security agreements in favor of the Investors.  Thus, the Investors did not become "Secured Part[ies]" recognized under IIR's loan documents.

In addition, the collateral described in IIR's and Investors' 11% and 12% Agreements materially differ.  The Investors' 11% and 12% Agreements define "Collateral" as the "Borrower's [Biz Radio's]" (i) "Equipment," (ii) "Furniture and Fixtures," and (iii) all "Proceeds" therefrom.[44]   The IIR-BR Houston Security Agreement and Note define "Collateral" as also containing categories of assets different from those in the Investors' collateral.  The Investors' collateral did not include: (i) "Membership Interests," (ii) "Accounts," (iii) "Intangibles," (iv) "Contracts," (v) "Leases," and (vi)"Other Contracts."[45]   These distinctions further weigh against finding that the Investors' funds were intended by BR Houston to be the "Replacement Financing" contemplated in the IIR-BR Houston Security Agreement and Note.  Accordingly, the Investors' loan documents do not grant those Investors security interests in the BR Houston collateral pursuant to the IIR-BR Houston Security Agreement.

### 2.    Investors' Unperfected Interests

---

[44]      *See* Investors Ex. 2, at 2-3, ¶ 2.

[45]      *Compare* STB Ex. 46, Ficks Security Agreement for 11% Account *and* STB Ex. 27 Subramanian Junior Security Agreement for 12% Account, *with* Investors Ex. 2 IIR-BR Houston Security Agreement, at 2-3, ¶ 2.

For the Investors to establish senior interests in BR Houston assets, the Investors would have had to hold "perfected interest[s]" under law.  Section 9.502(a)(2) of the Texas Business and Commerce Code (the Texas version of the Uniform Commercial Code ("Texas U.C.C.")) provides that a financing statement is effective only if it "provides the name of the secured party or a representative."  IIR perfected its security interests when WB Fund II, as IIR's agent, filed a U.C.C. financing statement listing WB Fund II as the "Administrative Agent for Industrial Info Resources, Inc., and other senior lenders."[46]  The Investors made their loans through WB Development Partners, not WB Fund II.  However, the Investors argue that WB Fund II is an agent of WB Development Partners, and that the Investors thus can benefit as secured creditors through WB Fund II.  The Investors' argument is unsupported by any evidence of an agency relationship.[47]  Accordingly, the Investors' argument that WB Fund II is their "representative" and identified on IIR's U.C.C. financing statement in accordance with section 9.502(a)(2) is rejected.[48]

---

[46]     *See* Investors Ex. 4.

[47]     Counsel's oral argument to this effect is insufficient.

[48]     It is noted there is no evidence Biz Radio (or any Business Radio entity) met the duty under the Investors' Security Agreements to perfect the Investors' interests. *See, e.g.*, STB Ex. 46 Ficks Security Agreement for 11% Account, at 3 ¶ 5; STB Ex. 27, Subramanian Junior Security Agreement for 12% Account, at 3 ¶ 5.

The Investors also rely on the reference generally to "other senior lenders" in IIR's UCC filing.[49]  This general term "other senior lenders" is insufficient to perfect any interests the Investors may claim here.  *See Matter of E.A. Fretz Co.,* 565 F.2d 366 (5th Cir. 1978).  A financing statement must give public notice of a possible security interest and must identify the secured party sufficiently to enable a third party to contact the secured for further information.  *In re Copper King Inn, Inc.,* 918 F.2d 1404, 1408 (9th Cir. 1990) (applying Montana law) (financing statement did not perfect third creditor's security interest where that creditor–one of the three secured creditors–was omitted from the statement); *In re Wilco Forest Machinery, Inc.*, 491 F.2d 1041, 1045 (5th Cir. 1974) (applying Alabama law) (financing statement provided reasonable notice where it was signed by a corporation that had ceased its separate corporate existence by merger, but was still in existence as a division in the newly merged corporation, and where statement identified the correct address for the division).  In *E.A. Fretz*, the Fifth Circuit held that subsidiaries of Revlon, a secured creditor, could not rely on a financing statement filed by their parent, even though the express purpose of the underlying security agreement was to secure payment of all debts owed to Revlon and "present and future divisions and affiliates of Revlon."  *Id.* at 368-72.  In  *Fretz*, unlike the case at bar, Revlon's UCC filing listed only that

---

[49]     *See* Investors Ex. 4.

company as the secured party, and did not recite or refer to other affiliated entities

generally or by name.  While IIR's UCC filing referred generally to "other senior

lenders" in addition to IIR and WB Fund II as agent for IIR, the reference is far too

vague to provide notice to third parties of Investors' putative interests.  There is no

indication who "other senior lenders" might be.  As the *Fretz* court explained:

> We are unwilling to impose on any junior secured creditor, with knowledge or
> without, the additional risk that, at a date subsequent to his perfection, any
> affiliate of the senior creditor or any stranger to it unnamed as secured parties
> in a security agreement or financing statement could be metamorphosed into
> senior or secured parties by virtue of an assignment "or otherwise."  We also
> decline to impose upon a junior secured creditor the burden of a frequent check
> to determine whether any secured parties have secretly assigned their claims to
> a senior secured party whose interest has been perfected.

*Id.* at 372.  In the instant case, IIR's UCC filing did not list the Investors by name or

through their agent WB Development Partners.  The IIR UCC filing fails to give

adequate public notice of the Investors' claims of security interests in BR Houston

assets.  Accordingly, even if the Investors could show their funds paid the IIR loan, the

Investors do not hold perfected security interests in BR Houston's assets under the

Texas U.C.C.

### C.   **Equitable Subrogation**

Alternatively, the Investors argue that they are equitably subrogated to the

claims of IIR.  Equitable subrogation applies "in every instance in which one person,

not acting voluntarily, has paid a debt for which another was primarily liable and

which in equity should have been paid by the latter." *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008) (quoting *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007)).   Because the Investors cannot establish that they (1) involuntarily (2) paid a debt primarily owed by another (3) in a situation that favors equitable relief, the Court denies their equitable subrogation claim.

### 1.    Third-Party Debt

"A right to subrogation is often asserted by one who pays a debt owed by another." *Frymire*,  259 S.W.3d at 143 (citation omitted).  In *Frymire*, the Texas Supreme Court stated the first requirement for equitable subrogation is that one person has paid a debt for which another was primarily liable.  *Id.*  In the instant case, it is uncontested that BR Houston was primarily liable for a debt to IIR.[50]  However, as discussed above, the vast majority of Investors cannot trace their funds to the repayment of IIR (or STB) debt.  Accordingly, these Investors have failed to show that they in fact paid a debt owed to IIR.  The only Investors who arguably have made a sufficient tracing showing are Erikson[51] and Ficks.

### 2.    Involuntary Payment

---

[50]    *See* Receiver's Pre-Hearing Brief [Doc. # 81], at 9-10; Investors Amended Pre-Hearing Brief [Doc. # 111], at 14.

[51]    The Court considers only Erickson's claim for a $150,000 loan to IIR.  *See supra* note 26.

The Investors have not shown that their payments were involuntary. "A payment is voluntary when the payor acts 'without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property.'" *Frymire*, 259 S.W.3d at 145 (citing *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993) (citations omitted)); *Oury v. Saunders*, 13 S.W. 1030, 1031 (Tex. 1890) (defining a voluntary payment as one made without "legal obligation").[52]

In *Frymire*, a hotel owner hired Price Woods (a general contractor) to remodel a hotel meeting room. 259 S.W.3d at 142. Price Woods subcontracted the air conditioning work to Frymire (a subcontractor). *Id.* As part of its contract with Price Woods, Frymire agreed (1) to pay for any damages caused to Price Woods or the hotel owner as a result of Frymire's performance of the work and (2) to obtain liability insurance to cover this indemnity obligation. *Id.* In the course of working on a chilled

---

[52] *See also Ruharts v. First Gibraltar Bank, FSB*, 896 F.2d 107, 115 (5th Cir. 1990) (quoting *Kone v. Harper*, 297 S.W. 294, 297 (Tex. Civ. App.—Waco 1927)) ("One who advances money to pay off an incumbrance on realty at the instance of either the owner of the property or the holder of the incumbrance, either on the express understanding or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien on the land, is not a mere volunteer, and in the event the new security is for any reason not a first lien on the property, the holder of such security, if not chargeable with culpable and inexcusable neglect, will be subrogated to the rights of the prior incumbrancer under the security held by him, unless the superior or equal equities of others would be prejudiced thereby, and to this end equity will set aside a cancellation of such security and revive the same for his benefit."), *aff'd sub nom. Ward-Harrison Co. v. Kone*, 1 S.W.2d 857 (Tex. Comm'n App. 1928, judg't adopted).

water line, Frymire installed an "Add-A-Valve" manufactured by Jomar.  *Id.*  The water line later ruptured at the site of Jomar's valve.  *Id.*  Although the rupture apparently was caused by the faulty valve, the hotel owner sought indemnification from Frymire pursuant to the terms of its contract.  Frymire's insurer paid the hotel.  Subsequently, Frymire, through its insurer, sued Jomar to recoup the indemnification payment to the hotel, claiming damages from Jomar's negligence, product liability, and breach of warranty.

Frymire relied on the hotel's rights and sued under a theory of equitable subrogation.  The central issue was whether Texas law permitted Frymire to "step into the shoes of and pursue the claims" that the hotel had against Jomar.  *Id.*  The court held that Frymire's indemnification payment to the hotel was "involuntary": Although "Frymire's decision to contract with Price Woods was voluntary, its duty to honor that contract was not."  *Id.* at 146.  Thus, "having acted to satisfy a legal obligation and to protect its interests under the contract (and its reputation in the marketplace), Frymire involuntarily extinguished a debt primarily owed by Jomar to the hotel owner."  *Id.*  The fact that Frymire's obligation to pay the hotel arose from Frymire's contract with Price Woods (an innocent party) rather than Jomar (an alleged wrongdoer) was central to the court's holding.  The court emphasized, "Frymire would lack standing to seek equitable subrogation if Frymire had contracted with Jomar, rather than with Price Woods, to pay the hotel's damages caused by Jomar."  *Id.*  In contrast to *Frymire*,

there simply was no obligation on the Investors to pay IIR's loan owed by BR Houston. The Investors in this case did not contract with IIR, the innocent party in the case. Rather, the Investors' promissory notes and security agreements were with Biz Radio, an alleged wrongdoer, and distinct from BR Houston, the debtor on IIR's loan. Accordingly, the Investors are not entitled to equitable subrogation to IIR's priority secured interest on assets of BR Houston.[53]

### 3.    Superiority of Equitable Interests

Under equitable subrogation, the equity of the party seeking subrogation must be superior to that of other claimants, 50 AM. JUR. SUBROGATION §12 at 690-91. The burden is on the party claiming equitable subrogation to establish his entitlement. *In re Hwang*, 452. B.R. 187, 193 (N.D. Tex. 2011); *Murray v. Cadle Co.*, 257 S.W.3d 291, 300 (Tex.App.—Dallas 2008) (citations omitted). The trial court has discretion to balance the equities in view of the totality of the circumstances. *Murray,* 257 S.W.3d at 300 (citing *Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 519-20 (Tex. 1969)). In conducting this balancing test, courts generally consider factors such as (1) whether there was negligence on the part of the party claiming subrogation, (2) whether that party had notice of other interests, and (3) whether the superior or equal

---

[53]    The Investors may claim their payments were involuntary because they intended to pay money to Biz Radio, the entity on their Notes and Security Agreements, not BR Houston. This argument is unavailing. Biz Radio did not owe IIR any debt and gave no collateral as security to IIR. Thus, there is no basis for equitable subrogation on this basis.

equities of other interests will be prejudiced if equitable subrogation is allowed. *Id.* at 299-300 (citations omitted).  Here, all three factors weigh against the Investors.

The Investors did not know the nature of their investments and failed to undertake due diligence.[54]  They have presented no proof they sought information about the loans they were extending or the loan documents.  The documents the Investors signed did not identify BR Houston as the entity to which they allegedly loaned the funds.  Closer examination by the Investors or others for their benefit likely would have brought to light many of the deficiencies now in issue.  To the extent the payments were intended to retire BR Houston's debt to IIR or STB, the Investors also failed to perfect their alleged security interests by filing any U.C.C. financing statements, let alone financing statements properly identifying the Investors or an agent for them.  The Investors had constructive notice of other investors, including STB's perfected junior lien on the radio station.  Further, granting the Investors a priority interest would unfairly prejudice others who invest in or through KCM and Wallace Bajjali or related entities.  Equity does not support equitable subrogation in favor of the Investors.

---

[54]      *See* Ellisor Test. [Doc. # 138], at 177-178.

## III.   CONCLUSION

Because all but two of the Investors have failed to trace their funds to payments of BR Houston's debts to IIR or STB, all have failed to show the equities support tracing, all have failed establish various elements of a claim for contractual subrogation, and all have failed to meet their burden on equitable subrogation, the Investors' Objections are rejected. Accordingly, it is hereby

**ORDERED** that Investors' Objections seeking priority security interests in the proceeds of the sale of the BR Houston radio station assets are **DENIED**.

SIGNED at Houston, Texas, this **2**nd day of **December, 2011.**

Nancy F. Atlas
United States District Judge