## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-3674 |
| | § | |
| ALBERT FASE KALETA and | § | |
| KALETA CAPITAL, | § | |
| MANAGEMENT INC. *et al.*, | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| BUSINESSRADIO NETWORK, L.P. | § | |
| d/b/a BizRadio and DANIEL | § | |
| FRISHBERG FINANCIAL | § | |
| SERVICES, INC., d/b/a DFFS | § | |
| CAPITAL MANAGEMENT, INC., | § | |
| Relief Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court in this receivership proceeding are objections of certain

investors ("Objectors")[1] against a proposed settlement among Court-appointed

---

[1]    The Objectors are Carlos Barbieri, Richard Burkhart, Diane and Paul Collings (TR Dunn Family Trust), Steve Cook, Dr. Gerald Crouch, Ivan Curiel, Kevin Deering, Ronald and Lavonne Ellisor, Marcus Erickson, Kurt Everson, Robert Ficks, Johnny and Betty Gauntt, Ed and Helena Gray, Martin Grosbol, Bob and Kathy Horlander, Tony Huerta, Alisa K. Jones, Richard Kadlick, Don Keil, Timothy Koehl, Sailaja Uri Konduri, James Maas, Jack McElligot, Pamela McElligot, Larry Mullins, Florence Reiley, Doug and Kay Shaffer, Kohur Subramanian, George and Marene Tompkins (Tompkins, Inc.), Jacob Tsabar, James and Patricia Stewart, Raymond Warner, Paul and Simona Williams, and John Willis, as executor of the Estate of Geraldine J. Willis.

receiver, Thomas L. Taylor, III, Esq. ("Receiver"), and David Wallace, Costa Bajjali, and certain entities owned by or affiliated with Messrs. Wallace and Bajjali.   On September 12, 2011, the Receiver filed a Motion for Order Approving Proposed Settlement and for Ancillary Orders ("Motion").[2]   The Objectors responded by filing the "Investors' Objection to Receiver's Motion for Order Approving Proposed Settlement and for Ancillary Orders" ("Response"),[3] to which the Receiver timely filed a "Response to Objection to Proposed Settlement with Wallace Bajjali Parties" ("Reply").[4]   Having considered the full record in this case, the parties' arguments, and governing legal authorities, the Court **GRANTS** the Receiver's Motion.

---

Investors' Objections to Receiver's Motion for Order Approving Proposed Settlement and for Ancillary Orders ("Response") [Doc. # 124] at 1.

   Several Objectors named in the Investors' Response are not listed in the Receiver's Exhibit X, which identifies all known persons and entities to be bound by the proposed Bar Order.   *See* Bar Order List [Doc. # 113-1], Ex. X to Compromise Settlement and Release Agreement ("Settlement") at 140.   These absent Objectors are Carlos Barbieri, Richard Burkhart, Dr. Gerald Crouch, Ivan Curiel, Kurt Everson, Bob and Kathy Horlander, Don Keil, James Maas, Jack McElligot, Pamela McElligot, Jacob Tsabar, and Tony Huerta.   There is, however, a Jose Huerta" listed in Exhibit X.   It appears that these individuals, including Tony Huerta (to the extent that he is not the same person as or a representative of Jose Huerta), are not among the BR Note Holders whose claims would be affected by the proposed Bar Order.

   Finally, Exhibit X also includes investors who do not appear to be among the individuals represented by the Schmidt Law Firm.   *See id.*   These investors are Youssef Boutrous, John Dosier, Dan Gunderson, Glenn and Ann Latta, Barbara Ploetz, Eric Rothenberg, Bruce Ruisard, Blake Taylor, Ethelyn Taylor and Ton Taylor.

[2]      Mot. [Doc. # 113].

[3]      Resp. [Doc. # 124].

[4]      Reply [Doc. # 142].

## I.   <u>BACKGROUND</u>

Defendants Albert Kaleta ("Kaleta"), Daniel Frishberg ("Frishberg"), and Kaleta Capital Management ("KCM") allegedly perpetrated several frauds related to promissory-note securities.  In one such scheme, they solicited investors, to make loans to various entities related to a radio station ("BR Radio Entities"). The Objectors invested in one or more of the BR Entities[5] through their agent, Wallace Bajjali Development Partners, LP ("WB Development Partners").   In return, at least some of the Objectors received promissory notes ("BR Promissory Notes").

Messrs. Wallace and Bajjali own, control, and/or are otherwise affiliated[6] with WB Development Partners, Wallace Bajjali Investment Fund II, L.P. ("WB Fund II"), West Houston WB Realty Fund, L.P. ("W. Houston Fund"), LFW Economic Opportunity Fund., L.P. ("LFW Fund"), and Spring Cypress Investments, L.P. ("Spring Cypress") (collectively, the "WB Parties"). W. Houston Fund, LFW Fund and Spring Cypress (collectively, the "Note

---

[5]     For purposes of the pending Motion, it is immaterial which particular BR entity borrowed an Investors' funds because the Bar Order broadly defines "BR Note Holders" as "investors, their heirs, successors, agents and assigns, who subscribed to the BusinessRadio Note Plan and/or made loans to BusinessRadio or its affiliates by or through any of the Wallace Bajjali Parties as their agent."  *See* Settlement [Doc. # 113-1], Ex. 1 to Mot. § 2.12.

[6]     The Receiver's Motion indicates that Messrs. Wallace and Bajjali are the "principals" of Note Entities, W. Houston Fund, LFW Fund and Spring Cypress. Mot. ¶ 12.

Entities") received from KCM funds that included the proceeds of the allegedly fraudulent offerings to Objectors by Defendants.   In return, each Note Entity executed a promissory note payable to KCM ("WB/KCM Notes").

On November 13, 2009, the Securities and Exchange Commission ("SEC") commenced this action against Kaleta, Frishberg, and KCM, alleging violations of the anti-fraud provisions of the federal securities laws.[7]   Subsequently, the Court appointed Taylor as the Receiver for KCM[8] and Relief Defendants BusinessRadio Network, L.P. d/b/a BizRadio ("BR Network") and Daniel Frishberg Financial Services, Inc. d/b/a DFFS Capital Management, Inc. ("DFFS")[9] (collectively, the "Receivership Entities").   Under the Court's orders, the Receiver is authorized: (1) to take and have complete and exclusive control, possession, and custody of the Receivership Estate[10] and any assets traceable to

---

[7]   Compl. [Doc. # 1].  The SEC subsequently filed an additional enforcement action against Messrs. Wallace and Bajjalli.  *See SEC v. Wallace et al.*, No. 4:11-cv-01932 (S.D. Tex. May 25, 2011).  The court in that action ultimately entered Agreed Final Judgments against Wallace and Bajjali individually, permanently enjoining each from future violations of section 17(a) of the Securities Act of 1933 and imposing on each a civil penalty of $60,000.  *See id.* [Docs. ## 5, 6].

[8]   Agreed Order Appointing Receiver ("Receiver Order") [Doc. # 7].

[9]   Order Modifying Order Appointing Receiver ("Modified Receiver Order") [Doc. # 34].

[10]   The "Receivership Estate" consists of the Receivership Assets and the Receivership Records.  Receiver Order, ¶ 2.  "Receivership Assets" are "the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendant and all entities it owns or controls."  *Id.* ¶ 1; Modified Receiver Order at 1. "Receivership Records" are "the books and records,

4

assets owned by the Receivership Estate;[11] (2) to collect all sums of money due or owing to the Receivership Estate;[12] (3) to institute actions to obtain possession and/or recover judgment with respect to persons or entities who received assets traceable to the Receivership Estate;[13] (4) to contract and negotiate with any claimants against the Receivership for purposes of compromising or settling any claim;[14] (5) to institute, prosecute, or compromise such actions that the Receiver deems necessary and advisable to carry out the Receiver's mandate;[15] and (6) to preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement to claimants.[16]

      The Receiver explains that he spent months analyzing the Receivership Estate's potential claims against each of the WB Parties, the likelihood of success on the merits, the expense of litigation (both to the Estate for prosecuting those claims and to the WB Parties for defending against them—expenses which would

---

client lists, account statements, financial and accounting documents, computers, computer hard drives, computer disks, internet exchange servers telephones, personal digital devices and other informational resources of or in possession of the Defendant, or issued by Defendant and in possession of any agent or employee of the Defendant." Receiver Order ¶ 1; Modified Receiver Order at 2.

[11]    Receiver Order ¶¶ 4, 5(b).

[12]    *Id.* ¶ 5(b).

[13]    *Id.* ¶ 5(c).

[14]    *Id.* ¶ 5(f).

[15]    *Id.* ¶ 5(i).

[16]    *Id.* ¶ 5(j).

affect what funds would be available to satisfy any potential judgment in favor of the Receiver), the length of any potential litigation, and the personal and entity financials of the WB Parties.[17]   The Receiver also spent months negotiating the Settlement to reach terms that would net the Estate the maximum recovery after expenses.

On September 12, 2011, the Receiver filed the instant Motion seeking approval of a proposed Compromise Settlement and Release Agreement ("Settlement") among the Receiver and the WB Parties, including Messrs. Wallace and Bajjali.   The Receiver sent notice of the Motion and proposed Settlement to all known BR Note Holders.[18] The Objectors responded on October 3, 2011, and the Receiver replied on October 18, 2011.[19]

The proposed Settlement has five primary components:

***Replacement Notes Personally Guaranteed by Messrs. Wallace and Bajjali.***— W. Houston Fund, LFW Fund and Spring Cypress ("Note Entities") will execute replacement promissory notes ("Replacement Notes") reaffirming

---

[17]    Mot. [Doc. # 113] ¶ 13.

[18]    *Id.* ¶ 8; Reply at 8-9.  *See also* Notice of Proposed Settlement and Proposed Final Claim Bar Order [Doc. # 113-1], Ex. A to Settlement at 21-23.

[19]    Resp. [Doc. 124].  Upon the Court's Order [Doc. # 164], the Receiver also delivered to the Court for *in camera* inspection copies of the financial documentation of the Wallace Bajjali Parties, which the Court has carefully reviewed.  The Receiver also filed a Supplement to Motion [Doc. # 165], clarifying its request for relief from the September 23, 2011 deadline to parties should the instant Motion be denied.

existing debts under the WB/KCM Notes and granting new and favorable repayment terms.[20]  The principal amounts owed on the Replacement Notes total $879,176.35 comprised of: $595,176.35 owed by W. Houston Fund, $275,000 owed by LFW Fund, and $9,000 due from Spring Cypress.[21]  Messrs. Wallace and Bajjali will guarantee the full amount of each Replacement Note.[22]  The original WB/KCM Notes are unsecured and are not personally guaranteed.[23]

*"Cash Flow Note" Personally Guaranteed by Messrs. Wallace and Bajjali.*—WB Development Partners will execute a promissory note ("Cash Flow Note") to Receiver for an expected[24] payment of between $300,000 and $450,000, the specific amount to be based on "dedicated cash flow" (as defined in the Cash Flow Note) from a development project in Amarillo, Texas ("Amarillo Project").[25]  Messrs. Wallace and Bajjali also will guarantee the Cash Flow

---

[20]     Mot. ¶ 6(1); Settlement § 4.1.

[21]     Mot. ¶ 4; Replacement Notes, [Doc. # 113-1], Exs. C, D, E, F, G, and H to Settlement at 28-55.  The parties have agreed on an applicable weighted interest rate of approximately 12.15% and, as of the filing of the Motion, approximately $286,875.37 in interest was due.  *See* Mot. ¶ 15.  The accrued interest on these Notes is part of the Receiver's assets.  *Id.* ¶¶ 15, 17.  The maturity dates of the WB/KCM Notes were extended by Replacement Notes based on the liquidity of the respective Note Entity, with an outer repayment deadline of December 31, 2012.  *Id.* ¶¶ 16, 17.  The Estate will be compensated by accruing interest totaling $142,204.13, if all the Replacement Notes are not paid until that deadline.  *Id.*

[22]     *Id.* ¶ 6(2); Settlement § 4.2.

[23]     Mot. ¶ 17.

[24]     *See* Cash Flow Note [Doc. # 113-1], Ex. U to Settlement at 122, § 1(b)(ii).

[25]     Mot. ¶ 6(3); Settlement § 4.3.

7

Note's "dedicated cash flow" under most circumstances.[26]  The Cash Flow Note and the accompanying Wallace and Bajjali guarantees currently are not part of the Receivership Assets; they are additional consideration negotiated by the Receiver for the Settlement.[27]

> ***Release of the WB Parties.—*** The Receiver and the Receivership Entities will fully release each of the WB Parties from any and all claims which could be asserted by him on behalf of the Receivership Estate or the Receivership Entities against any of them.[28]

> ***Releases by the WB Parties.—*** The Settlement provides that the WB Parties will fully release the Receiver, the Receivership Estate, and the Receivership Entities from any and all claims which could be asserted by any of them against the Receiver, the Receivership Estate, and the Receivership Entities.[29]  This release would not affect the rights of other WB Parties, excluding Messrs. Wallace and Bajjali individually, to participate in the claims process for the Receiver's ultimate plan of distribution of Receivership Assets.[30]

---

[26]   Mot. ¶ 6(4); Settlement § 4.4.

[27]   Mot. ¶ 18.

[28]   Mot. ¶ 6(5); Settlement § 5.2.

[29]   Mot. ¶ 6(6); Settlement § 5.3.

[30]   Messrs. Wallace and Bajjali would be excluded from participating in the Receiver's ultimate plan of distribution of Receivership Assets.  *See* Settlement § 5.3.1(a).

***Bar of Certain Actions by BR Note Holders.*** — The Receiver seeks entry of an order ("Bar Order") barring for all time claims of "BR Note Holders"[31] against the WB Parties in connection with or related to loans or promissory notes obtained through any WB Party as agent and issued by any BR Entity.[32]  The Bar Order thus would enjoin these note holders (including the Objectors) from commencing or continuing any legal proceeding and/or asserting or prosecuting any causes of action against any of the WB Parties "arising out of, in connection with, or relating in any way to the [BR Note Plan],"[33] loans made to the BR Entities or their related entities by the BR Note Holders, and/or notes issued by the BR Entities or their related entities to the BR Note Holders.[34]  The BR Note Holders (including the Objectors), however, would be able to assert their radio station loan-related claims through the claims process in the Receiver's ultimate plan of distribution of Receivership Assets.[35]

---

[31]      "BR Note Holders" are "the investors, their heirs, successors, agents and assigns, who subscribed to the [BR Note Plan] and/or made loans to [BR Entities or their affiliates] by or through any of the [WB Parties] as their agent."  Settlement § 2.12.

[32]      Mot. ¶ 6(7); Settlement § 4.7; *see* Bar Order [Doc. 113-1], Ex. B. to Settlement at 24.

[33]      The "BR Note Plan" is "that plan or series of transactions whereby investors made loans to [BR Entities or their affiliates] by or through any of the [WB Parties] as their agent."  Settlement § 2.11.

[34]      *See* Bar Order [Doc. 113-1], Ex. B. to Settlement at 24; Mot. ¶ 6(7); Settlement § 4.7.

[35]      Mot. ¶ 6(7); Settlement § 4.7.2.  The Receiver explains that the Bar Order would not affect the Objectors' claims or rights arising out of "'losses . . . incurred when [the

The Receiver emphasizes that approval of the Bar Order is a key and necessary condition of the Settlement.[36]   The Receiver argues the proposed Settlement terms are fair and equitable "to the Receivership Estate and all persons who have substantive claims against the Receivership Estate."[37]   The Receiver urges that settlement of the WB/KCM Note claims and any others the Receiver may have on behalf of the Estate against Wallace and Bajjali individually and as principals of the Note Entities or other WB Entities, or against the other WB Parties, would be hotly contested and result in expensive litigation with uncertain results.[38]   He points out litigation against the WB Parties would cost the Estate, "conservatively, $250,000 to $300,000."[39]   He urges that the Settlement, which is a compromise consisting of interrelated compromises, is necessary to "maximize[e] Estate assets and minimize[e] the expenses incurred to obtain them."[40]

The Objectors disagree.   They contend the Settlement is seriously inadequate, arguing that the Settlement allows the WB Parties to pay only

WB Parties] made alleged equity investments in BizRadio" or losses arising out of real estate investments outside the Receivership entities.  Reply at 7 (quoting Resp. at 3).

[36]   *See* Mot. ¶ 26.

[37]   *Id.* ¶ 12.

[38]   *Id.* ¶ 38.

[39]   *Id.* ¶ 14.

[40]   Mot. ¶ 38; Reply at 2.

$300,000 plus previously acknowledged promissory notes and grants the WB Parties release from all further actions by the Receiver as well as a bar of all other investors' claims against the WB Parties.[41]  The Objectors seek to pursue their own claims against the WB Parties for the alleged misconduct associated both with the loans made to the BR Entities and other investments.

After close scrutiny of the record, the parties' arguments, and the applicable law, the Court concludes, for reasons explained in detail, that equity warrants approval of the Settlement. The Settlement is in the best interests of all the Estate's claimants, including the Objectors and others in their posture.

## II.   LEGAL STANDARDS

"The federal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws."   *SEC v. Wencke*, 622 F.2d 1363, 1368-69 (9th Cir. 1980) (observing that a district court's authority to issue an order staying a non-party from bringing litigation derives from "the inherent power of a court of equity to fashion effective relief") ("*Wencke II*"); *see also SEC v. Safety Fin. Serv.*, 674 F.2d 368, 372-73 (5th Cir. 1982).  The Fifth Circuit has long endorsed other circuits' propositions that "(a)ny action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless

---

[41]      Resp. at 3.

11

there is a clear showing of abuse." *Safety Fin. Serv.*, 674 F.2d at 373 (quoting *SEC v. Ark. Loan & Thrift Corp.*, 427 F.2d 1171, 1172 (8th Cir. 1970)). "It is recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity." *Id.* (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978)). "[A] district court has wide discretion to administer proceedings in an equity receivership— including the approval of settlements." *Gordon v. Dadante*, 336 F. App'x 540, 551 (6th Cir. 2009) (unpublished). Because "[a]n anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership," *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) (upholding injunction against claimants filing bankruptcies against receivership assets), a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC actions. *See SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x, 338, 340-41 (5th Cir. 2011) (unpublished) (citations omitted); *Liberté Capital Group, LLC v. Capwill*, 462 F.3d 543, 551-52 (6th Cir. 2006) (citations omitted); *see also SEC v. Byers*, 609 F.3d at 91 ("While it is a power to be exercised cautiously, district courts may issue anti-litigation injunctions barring bankruptcy filings as part of their broad equitable powers in the context of an SEC receivership.").

"[N]o federal rules prescribe a particular standard for approving

12

settlements in the context of an equity receivership; instead, a district court has wide discretion to determine what relief is appropriate." *Gordon*, 336 F. App'x at 548. Although a court is not obligated to follow any particular procedure, courts have stayed proceedings by non-parties against a court-imposed receivership after finding an appropriate showing of necessity. *See Wencke II*, 622 F.2d at 1371-72. In determining whether a stay is necessary, courts may consider factors such as the value of the proposed settlement, the value and merits of Receiver's potential claims, the value and merits of any foreclosed parties' potential claims, the complexity and costs of future litigation, the risk that litigation costs would dissipate receivership assets, the implications of any satisfaction of an award on other claimants, and any other equities attendant to the situation. *See Liberté Capital*, 462 F.3d at 553 (citations omitted); *Wencke II*, 622 F.2d at 1371; *Gordon*, 336 F. App'x at 544, 549. In the absence of any evidence that a proposed settlement is of insufficient value, a district court may conclude that a proposed settlement amount is sufficient. *See Gordon*, 336 F. App'x at 548.

## III.   **DISCUSSION**

The Objectors make several arguments in opposition to the proposed Settlement. Their primary argument is that the amounts to be collected by the Receivership Estate are insufficient in light of the WB Parties' assets, the WB Parties' admission of previously-owed WB/KCM Notes, and the Objectors'

13

claims against the WB Parties, which they argue led to losses in excess of $15,000,000. They argue that the Settlement is inadequate because the WB Parties are not releasing the Receiver from their claims against the Estate. The Objectors argue that the Receiver lacks authority to foreclose the Objectors' claims against the WB Parties because those claims "involve the personal property rights of the [Objecting] Investors and other third parties" outside the Receivership Estate and the WB Parties are not among the Receivership Entities.[42] Finally, the Objectors contend that the Receiver inconsistently argued that "the Investors' security interests in the station [we]re invalid" in connection with the sale of the BusinessRadio assets, and yet here wants "to absolve [the WB Parties] of any liability to Investors for their negligence and other torts."[43]

Having carefully considered all the arguments by the Objectors and the Receiver's responses, the terms of the proposed Settlement, and the governing legal authorities, the Court concludes that the proposed Settlement is sufficient, fair, and necessary. The Objectors' objections to the Settlement are overruled.

***"Replacement Notes."***— The Objectors argue that the settlement funds to be collected in this regard are inadequate because the WB Parties, specifically the "Note Entities," already have admitted these existing obligations. The Objectors

---

[42]     Resp. at 2, 5.

[43]     *Id.* at 2.

thus contend that this aspect of the Settlement provides no additional benefit for the Receivership Estate.[44]

The Receiver responds, and the Objectors do not contest, that the Note Entities have admitted to owing some debts but, significantly, do not admit the amount or scope of the debts.[45]   Under the proposed Settlement, the obligations are liquidated; the Note Entities would agree they are obligated to the Receivership for $1,177,755.77 through October 18, 2011, with continuing accrual of interest at a favorable rate of an average of 12% after that date.[46]   The Replacement Notes aspect of the Settlement will result in payments to the Receivership Estate of approximately $1.2 to $1.3 million.[47]   The Receiver also establishes without contradiction that the agreed quantification of these obligations is a material benefit to the Receivership Estate because the WB/KCM Note transactions were "chaotic and poorly documented" and "not readily susceptible to proof" and there are possible defenses that could be raised to complicate the litigation.[48]   It is also apparent that the Receiver expects the WB Parties (including the Note Entities) to strenuously contest claims against them.

---

[44]      *Id.*

[45]      Reply at 5.

[46]      Mot. ¶ 15; Reply at 5.

[47]      *Id.* ¶ 14.

[48]      Reply at 5.

15

"Absent the Settlement, the requirement of litigation to establish these obligations and to prove up their amounts would be an expensive and time-consuming process"[49] that likely would deplete actual and potential Receivership Estate assets through legal fees that would be incurred by the Receiver prosecuting.[50] The Receiver estimates that the litigation fees and expenses for the Estate could reach $250,000 to $300,000.[51] These fees would harmfully reduce available Receivership Estate funds for distribution to claimants. In addition, the WB Parties' defense fees and costs would likely deplete those parties' assets available to the Receiver if the debt collection litigation were successful.[52] The Objectors have not attempted to refute these points or the Receiver's concerns about difficulty of collection of any judgment against the various WB Entities.

The Court concludes that it is far from clear that the Receiver's claims on the original notes would be collectible. The Court has reviewed the financial documents of the WB Parties submitted *in camera*[53] and credits the Receiver's assessment that the settlement represents the maximum that can be paid by the

---

[49]     *Id.*

[50]     Mot. ¶ 22.

[51]     *Id.* ¶ 14.

[52]     *Id.* ¶¶ 14, 22.

[53]     *See* Order [Doc. # 164].

WB Parties.[54]   Obtaining through negotiations the uncontested personal guarantees of Messrs. Wallace and Bajjali provides important additional consideration from the WB Parties for the proposed Settlement.   The original WB/KCM Notes were not personally guaranteed,[55] and guarantees could not be obtained through litigation.

The Court concludes that Replacement Notes with the personal guarantees of Messrs. Wallace and Bajjali are material benefits for the Receivership Estate above and beyond the Note Entities' existing liability under the WB/KCM Notes. The quantification and collectability of any judgment against the WB Parties is of paramount concern for the Estate and is questionable without the Note Holders' reaffirmation of these obligations and Messrs. Wallace and Bajjali's personal guarantees.   Accordingly, the Court rejects the objection that the Replacement Notes are of insufficient value.

*Cash Flow Note.*— The Objectors also argue that the amount of the Cash Flow Note is inadequate because there is no evidence to suggest that the cash flow from the Amarillo Project is likely to result in an obligation above $300,000. The Objectors further point out that if the WB Parties pay $300,000 within the

---

[54]    *See* Mot. ¶ 24.

[55]    *Id.* ¶ 17.

first eighteen months, the rest of the debt on the Cash Flow Note is extinguished regardless of the cash flow from the Amarillo Project.[56]

The Receiver counters that the Cash Flow Note and personal guarantees of Messrs. Wallace and Bajjali are "additional consideration negotiated by the Receiver for the release of the [WB Parties] and the entry of the Bar Order."[57] The Court agrees with the Receiver that the Cash Flow Note with the partial personal guarantees of Messrs. Wallace and Bajjali meaningfully enhances the actual value of the Receivership Estate.   The Objectors have not supplied evidence or any meaningful analysis that the Cash Flow Note amount is insufficient or that additional sums are collectable at all, let alone net of litigation expenses.  This objection is overruled.

*WB Parties' Real Estate Assets.*— The Objectors argue that the proposed Settlement fails to take into account "millions of dollars in real estate assets held by the Wallace Bajjali companies."[58] The Receiver counters persuasively that the real estate assets are held by "real estate partnerships"[59] that are "investment vehicles through which members of the public—including but not limited to

---

[56]    Resp. at 2-3; *see also* Cash Flow Note [Doc. # 113-1], Ex. U to Settlement at 122, § 3.

[57]    Mot. ¶ 18.

[58]    Resp. at 3.

[59]    It appears that the parties' references to "real estate partnerships" are to WB Fund II, WB Houston Fund, and LFW Fund.  *See* Reply at 3.  It should be noted that WB Houston Fund and LFW Fund are also "Note Entities."

18

certain of the Objectors—made investments as limited partners."[60]   The evidence of record establishes that these real estate assets are not available to satisfy a judgment against Messrs. Wallace and Bajjali personally because "the [real estate assets] are owned by their limited partners, not their general partners or Messrs. Wallace and Bajjali individually."[61]   The Receiver further points out that he is unaware of WB Fund II or the Note Entities having engaged in any wrongful or actionable conduct regarding the Receivership Entities (other than the latter not having paid the WB/KCM Notes).[62]   Last, the Objectors have not established that these real estate assets are legally available to pay the Objectors' particular claims.  Accordingly, this objection is overruled.

   ***Individual Earning Potential.***— The Objectors also argue that the proposed Settlement fails to take into account the fact that Messrs. Wallace and Bajjali personally are likely to "earn income in future years."[63]   The Objectors have not established with any specificity what claims they have against Messrs. Wallace and Bajjali individually or the extent of Messrs. Wallace and Bajjali's potential future earnings.   In any event and significantly, the Receiver has considered their earning potential by including in the proposed Settlement

---

[60]      *See* Reply at 3-4.

[61]      *See id.*

[62]      *See id.* at 2.

[63]      Resp. at 3.

important personal guarantees from these individuals. This objection is overruled.

**_Value of Objectors' Claims._**— The Objectors also argue that the settlement amount is insufficient in view of their putative claims against the WB Parties. The Objectors estimate their claims and losses to be greater than $15,000,000, consisting of approximately $5,000,000 on claims relating to the BR Promissory Notes, $6,000,000 on claims relating to "real estate investments [having] nothing to do with the Receivership entities," and the balance relating to "alleged equity investments [in a BR Entity]" made by WB Parties.[64]

The Receiver counters without contradiction that the Objectors' claims relating to "real estate" and "equity investments" would _not_ be barred by the proposed Bar Order because these claims do not arise from promissory note investments made in a BR Entity by or through a WB Party as an agent (_i.e._, "BR Promissory Notes").[65] The Receiver acknowledges, however, that potential claims arising from the BR Promissory Notes would be barred, but argues here that the proposed limited bar is "a necessary compromise in order to achieve the totality of the Settlement proposal."[66] The Receiver explains that the WB Parties

---

[64]     _Id._

[65]     Reply at 7; _see also_ Settlement, §§ 2.11, 2.12; Bar Order [Doc. 113-1], Ex. B. to Settlement at 25.

[66]     _Id._ at 2.

wish "to settle any potential claims which could be brought against them in order to buy peace and avoid the expense of protracted litigation, which would ensue without a settlement with the proposed claim bar order."[67]

The Court concludes that the Objectors' claims arising from "real estate" or "equity investment" transactions would not be barred by the Bar Order and are not a viable basis for denying approval of the proposed Settlement.  The Court accordingly overrules this objection to this extent.

Regarding the value of the Objectors' claims relating to their loans to or investments in the radio station entities or assets, the Objectors have failed to provide factual detail, evidence, or meaningful analysis of the value or likelihood of success of their alleged claims against the WB Parties.  *Compare, e.g., Gordon*, 336 F. App'x at 548.  The Objectors' claims regarding the WB Parties in connection with the radio station assets will be addressed, along with similar claims of the other defrauded investors, during the Receivership estate distribution process.[68]

The Court notes that it has carefully considered the Objectors' assertions that they have suffered substantial losses and want to assert claims for negligence, fraud, breach of fiduciary duty, negligent misrepresentation and civil conspiracy

---

[67]     Mot. ¶ 5.

[68]     *See* Reply at 2, 7.

21

to defraud.[69]  The Objectors have not, however, provided information about the viability of their legal theories, the damages on any particular claims, or the collectability of a judgment on the claims. Indeed, there are many others who also claim to have suffered serious losses and damages because of "investments" in or "loans" to radio station entities or assets.  In cases where investors are similarly defrauded, equity favors treating them alike.  *See*, *e.g.*, *SEC v. Forex Asset Mgmt.*, 242 F.3d 325, 331 (5th Cir. 2001); *U.S. v. Durham*, 86 F.3d 70, 73 (5th Cir. 1999); *SEC v. PrivateFX Global One, Ltd., et al.*, 778 F. Supp. 2d 775, 783 (S.D. Tex. 2011).  The equities do not support denying the proposed Settlement to enable the Objectors to seek favored treatment over others similarly positioned who invested through KCM.

>    ***Bar Order.***—  The Objectors next argue that the Court lacks authority to impose the Bar Order on them as part of the Settlement and that the authority cited by the Receiver is inapplicable.  The Objectors point out that the circumstances and the scope of the injunctions in *Byers*, *Wencke II*, and *Liberté Capital* are distinct from the proposed Bar Order at issue.[70]  These case distinctions do not mandate a different outcome here.  This Court, as any court of

---

[69]       *See* Resp. at 4.

[70]       *See* Resp. at 5-6.  For example, *Byers* involved a preliminary injunction to protect receivership assets, and *Wencke II* and *Liberté Capital* involved litigation stays of third parties' claims against receivership entities.  *See Byers*, 609 F.3d at 91; *Wencke II*, 622 F.2d 1367; *Liberté Capital*, 462 F.3d at 551.

equity, considers legal precedent, including the types of stays or injunctions imposed by other courts.  However, receivership cases are highly fact-specific.  In the instant case, the WB Parties were directly involved in Defendants' radio station business, having acted as actual agents for the BR Note Holders' loans to the BR Entities.  The Receiver's goal of limiting litigation involving the BR Entities in regard to radio station liabilities and assets is appropriate to enable the Receiver to collect as many assets as possible for distribution among all defrauded investors.  The Bar Order advances that goal by arranging for reasonably prompt collection of the maximum amount of funds possible from the WB Parties under the present litigation and financial circumstances.  Preclusion of the BR Note Holder's alleged claims relating to putative investments or loans to a BR Entity made through a WB Party in order to collect substantial sums without litigation costs and delay is of substantial value to the Objectors and all others similarly positioned.  Furthermore, as noted, the Objectors have not presented evidence to counter the Receiver's concerns about collection of any judgment against the various WB Entities.

   ***WB Parties' Claims Against the Receivership***.— The Objectors also claim that the WB Parties are "not releasing the Receiver from their claims against the Estate."[71]  The Objectors overstate the effect of the proposed Settlement.  While it

---

[71]      Resp. at 2.

P:\ORDERS\11-2009\3674SettlementWBParties.docx.2.7.2012.11:57:53

is true that the publicly-owned WB Entities would not be required to relinquish their claims as investors to participate in the Receiver's ultimate plan of distribution,[72] the Settlement does require Messrs. Wallace and Bajjali individually to release all claims against the Receivership Estate, including any claims that these individuals could assert personally in the claims process associated with an ultimate plan of distribution.[73]

The Court concludes that the proposed releases are sufficient and fair. The Settlement requires Messrs. Wallace and Bajjali to release all their personal claims against the Receivership Estate. The Receiver also correctly states, without contradiction by the Objectors, that the WB Entities that are publicly-owned partnerships (*i.e.*, owned by investors other than or in addition to the Objectors) should be permitted to participate in the claims process in an ultimate plan of distribution. The Objectors' objection on this basis is therefore overruled.

---

[72]    *See* Settlement, § 5.3.1. The Settlement provides that the WB Parties (including their officers, agents, predecessors, etc.) release *inter alia* the Receiver, the Receivership Entities (*e.g.*, KCM and BR Entities), and the Estate from all claims arising from the BR Note Plan and the litigation pending in this Court, but ***do not release*** (1) claims by WB Parties (other than Wallace and Bajjali's) to Estate assets relating to the Receiver's ultimate plan of distribution, ***and do not release*** (2) claims the WB Parties may have against the "agents, officers, directors and representatives of the Receivership Entities, other than those persons who are Wallace Bajjali Released Parties (*e.g.*, WB Parties and their officers), including without limitation the following individuals or their respective past, present, and future heirs, successors, agents, and assigns: Albert Fase Kaleta; Daniel S. Frishberg; and Elisea T. Frishberg." *Id.* § 5.3.1(a)-(b). Thus, the WB Parties retain the right to assert claims against Kaleta, individually, and against Daniel and Elisea Frishberg, individually.

[73]    Reply at 9-10; *see also* Settlement § 5.3.1(a).

*Lack of Court Authority.—* The Objectors also argue in passing, in reliance on *Stern v. Marshall*, 131 S. Ct. 2594 (2011), that the WB Parties are not parties in any proceedings before this Court and thus are not subject to the Court's authority or jurisdiction.[74]  This contention is rejected.  Significantly, this is not a bankruptcy proceeding and, unlike in *Stern*, the undersigned is an Article III judge who is not impaired by Article I bankruptcy judges' lack of plenary authority.  Furthermore, the Objectors personally have submitted to this Court's jurisdiction to the extent they have asserted claims for recovery against the Receivership Estate and/or made objections to the Receiver's actions.  The Court has broad powers and wide discretion in the supervision of an equity receivership and the issuance of "ancillary relief."  *See Byers*, 609 F.3d at 91; *Liberté Capital*, 462 F.3d at 551-52; *SEC v. Safety Fin. Serv.* 674 F.2d at 372; *Wencke*, 622 F.2d at 1369; *Gordon*, 336 F. App'x. at 549.

*Conclusion.—* The Court holds after careful consideration that the equities favor approval of the proposed Settlement in its entirety.  As noted above, the litigation risks of adverse outcomes on certain claims, the cost of complex, multi-party litigation, the unavailability of reliable documentation to prove the amounts of the various existing debts owed by the Note Entities, the likelihood that Defendants, the Note Entities, and the WB Parties would strenuously contest the

---

[74]     Resp. at 4, 5.

Receiver's positions, and the difficulty and lack of assurances about collectability of all judgments are valid, paramount concerns investigated carefully by the Receiver. These concerns persuade the Court that approval of the multi-faceted Settlement is warranted. These circumstances, when considered in their entirety, warrant approval of the proposed Settlement as the maximum that the Receiver likely could obtain from the WB Parties, particularly net of expenses after litigation by the Receiver or the Objectors in connection with BR Entities matters. The Court accordingly exercises its discretion to approve the Settlement.

### III.    CONCLUSION AND ORDER

The Settlement is an intricate, multi-part arrangement in which each party has agreed to make reasonable compromises. The Court approves and will enter the Receiver's proposed Order as submitted. The Receiver has established that the proposed Settlement is fair, equitable, necessary, and in the interest of the Receivership Estate and all its claimants. It is therefore

**ORDERED** that the Receiver's Motion for Order Approving Proposed Settlement and for Ancillary Orders [Doc. # 113] is **GRANTED** and the Objectors' objections [Doc. # 124] are **OVERRULED**. It is further

**ORDERED** that the Receiver's request relief from the September 23, 2011 deadline to add third parties is **DENIED** as **MOOT**.

SIGNED at Houston, Texas, this 7th day of **February, 2012**.

Nancy F. Atlas
United States District Judge

27